I'm here in the courtroom with Judge Sack. Judge Kearse is joining us by videoconference, so she'll appear on the screen. We have five cases on the calendar this morning, one of which we are taking on submission. The case on submission is No. 20-4156, United States v. Williams. So we'll move to our first argued case on the calendar, No. 21-549, Norales v. Acevedo. Mr. Hoffman. Good morning, and may it please the court. My name is Andrew Hoffman, and I represent James Norales, the appellate. This case represents a simple, straightforward question of whether a district court violates Rule 12 by considering one-sided snippets of extraneous defense exhibits and then credits those snippets over the well-pleaded allegations in plaintiff's complaint. I submit that it absolutely does. It violates Rule 12b-6 by failing to accept as true the factual allegations in the complaint and drawing all inferences in the plaintiff's favor. This included allegations that Mr. Norales' prosecution was grounded in coerced false statements from a mentally ill, intoxicated, quote-unquote, witness with a history of lying to police that was corroborated only by false claims in a complaint affidavit. Excuse me. Yes. You say, quote, witness, end quote. Is there any question that she was at the right place at the right time? I mean, whether she was a reliable witness is a different question. But are you saying she was not there, she didn't see what happened? She was intoxicated with multiple things. She was deeply mentally ill and given to hallucinations. And she said at different times, I don't know nothing. I don't remember nothing. I'm just questioning you using the quotation marks and wondering whether you were suggesting she, whatever her state of mind or ability to convey what she saw up to this, so you can hear me. I'm not sure you want to. In order to continue to convey what she saw, she was unable to do it. I just wanted to know whether you're saying she wasn't actually there with her eyes open. I don't think we know whether she was present. The only person who recognizes her in the video is her when she says she was present and saw the incident. Other times she says she didn't see the incident, doesn't remember the incident. Doesn't know about the incident. When you say she was coerced, it's because they made a deal over the drug charges against her, right? She continued to refuse to know anything, to have any information, until she was brought in on those drug charges and until she was threatened with nine years of prison if she didn't implicate Norales. So this happens frequently that there's a deal with prosecutors to avoid charges in exchange for testimony. Is there something different about this case or do you think we should decide that that is always impermissible? Well, or is it coercive? The fact that she concluded her remarks, the complaint talks about her unraveling, which I think is fairly clear that that's the end. You don't re-ravel. You don't put Humpty together again. She concluded her remarks at trial by saying, to this day, I still don't know who did it. That is a recantation. She also said at different times, I don't know nothing. I don't remember nothing. So even if she was there, there are real questions as to whether she perceived or remembered anything that made her a competent witness. And the only corroboration they had was the statements of Acevedo, which were misleading in the criminal complaint and in his grand jury testimony and trial testimony, that he had independently recognized Norales as the shooter, which was not true. Even the other side says it was not unaided. It was more of a now that D.T. has said she saw him, saw Norales do the shooting, the officer could then, after having this video in his possession for months, recognize Norales. Can you reveal why the officer became focused on Norales? It's a question. There is no DD-5. There is no documentation to tell us that at this point, absent any discovery. We know that his name came up at some point, and they put out an I-card as a witness, not a suspect. So somehow his name came into it. But again, from what we know now, and it's an argument to have a discovery, we don't know why. So the officer was focused on Norales as a suspect. And you're saying because they coerced the witness by offering her this deal to avoid jail time for the drug charges in exchange for her testimony, that meant that the testimony was unreliable and they lacked probable cause? It was unreliable on a number of fronts. The fact that she was given to hallucinations and mentally ill, the fact that she was on multiple intoxicants, the fact that she refused for months until she was finally presented with these charges. But you did identify him multiple times, right? She wasn't on hallucinogens all of the time, right? She had detox, she went and got treatment, she came back for interview with the prosecutor. During the incident, she was on intoxicants at the precinct when she allegedly picked Norales out of a photo array. She was on intoxicants. At some point, she went into detox. At some point, there's some interaction that results in her signing a cooperation agreement. We don't know anything about that because the notes from her interviews don't indicate that she identified Norales as a shooter. And then we get to the trial and she says, I still say I don't know who did it. A moment ago, you said it's not clear that she was at the incident, but didn't she call 911 from the incident? She called 911 from the incident. I think what is not known is what her exact proximity was to the shooting. The video quality is not good. You don't dispute that she was there, you just dispute that maybe she didn't see the shooting. I think that's correct, yes. Did you represent Mr. Norales in his criminal case? No, I did not, Your Honor. If there's no more questions, I'll reserve my time for rebuttal. Okay, thank you very much, Mr. Huffman. We'll hear from the first accolade, Mr. DeSilvio. Good morning, may it please the court, Lorenzo DeSilvio, on behalf of Detectives Acevedo and Faulkner. To jump right in, she called 911 at the grand jury testimony, which Norales is fine with this court looking at. She testified, there's the video, there's me in the video, and the video shows her looking at the shooter for at least five seconds. What did you say this court is fine with? So Norales has no objection to the court looking at the transcript of the grand jury proceeding. He did not object below, and he relies on it here. There's a transcript of the trial, too, and I want to make sure of that. The transcript of the grand jury proceeding is what I'm referring to, Your Honor. So here, the eyewitness identification provided at the very least arguable probable cause, and there weren't sufficient circumstances for a reasonable police officer to doubt the veracity of that. As Judge Menasche's questions probed, the police and prosecutors make deals all the time in exchange for testimony, although there's an allegation that she was prone to hallucinations. It doesn't say when, that it was occurring at the time of the shooting or at the time of identification. There's no dispute that she was sober, had detoxed by the time Norales was finally arrested. His arrest didn't happen until after that point in time. But what about the idea that the testimony, the identification was coerced to begin with? So there's no non-conclusory allegation as to what any of the detectives who interviewed D.T. on the day that she first came into the precinct did to somehow plant the idea in her mind that Norales was the shooter, particularly when at the grand jury proceeding she testified, I've known him since he was, quote, a little kid, and she was just feet away from him. And she also identified, yes, I was high, yes, I was drunk, but I was able to see him, and he was the person who did it. Well, Acevedo was focused on Norales. That's correct. And was pursuing D.T. to make an identification. That's correct. So isn't it reasonable inference that he was pressuring her to identify Norales? No, Your Honor, because he wasn't there. The only detectives who were interviewing D.T. were two identified detectives and a detective with Faulkner. Although they communicated with Acevedo, the allegations in their complaint are that Acevedo asked them to press D.T. regarding Acevedo's theory that Norales was the shooter. But that's the sum total of the allegations here. So he still communicated to the officers who were interviewing her that Norales was the shooter. That's correct. And he wanted an identification from her of Norales. That's correct. But here there's no dispute that she identified Norales unprompted and did so before the photo array was ever shown to her. And at the grand jury proceeding, both she and Detective Acevedo testified, I was shown a photo array, number three was Norales, I've known him since he was a kid. And it's just not accurate that the criminal complaint, which is that 119 of the joint appendix, was false by failing to disclose D.T.'s eyewitness identification. For starters, police just aren't required to put on positive evidence at that early stage in the criminal proceeding. And it couldn't have influenced the jury when, again, the grand jury transcript shows that she said, I was there, there's the video, there's me, there's the shooter. Additionally, the malicious prosecution claims for two- The criminal complaint did say that Acevedo identified Norales in the video, right? So that is the allegation. But, again, Norales has no problem with this court looking at the criminal complaint itself. And there it says, I reviewed the video, and the video depicts that Norales was the shooter. It doesn't say that I and I alone was able to identify Norales. So he's just saying because I know that the shooter is Norales from D.T.'s identification, I can now describe the video as depicting Norales. That's correct. But he wasn't saying that he made an identification of Norales from the video. Yes, that's correct, Your Honor. And the malicious prosecution claim also fails because there's no non-conclusive allegation of malice. And the allegations in the amended complaint at 37, 39, and 43 of the joint appendix make clear that the prosecutors knew everything that the detectives did about the purported unreliability of D.T. as a witness. So it's just not the case that detectives were leaning on the prosecutors. Prosecutors made an independent judgment when a sober D.T. agreed to testify against Norales at the criminal trial. The last point I'll make is that the conspiracy and failure to intercede claims fail because Norales agrees that if there's no violation, those claims fall out. And in any event, the conspiracy claims fail for the additional independent reasons that the detectives couldn't conspire with one another absent some sort of personal motivation that isn't alleged here. And the allegations in substance say, well, the detectives and the prosecutors talked with one another, which one would expect to happen all the time in any criminal investigation. Does the record reveal how Acevedo became focused on Norales to begin with? No, it does not. The record reflects that he put out the I-card, but it doesn't identify what source he had. He did not identify him as – he identified him only as, I believe, someone with information, not as a suspect before. It was only until D.T. came in and identified him unprompted and with the photo array that they believed that Norales was the shooter. Well, even before that, it's clear that he thought he was the shooter because that's what Acevedo communicated to the officers who were interrogating D.T., right? I think that's fair by the time that D.T. had come in. Yes, Your Honor. This court should affirm. Thank you very much, Mr. DeSilvio. Ms. Stackhouse. May it please the court. My name is Noreen Stackhouse. I represent ADA Rebecca Dunnan. Good morning, Your Honors. ADA Dunnan is entitled to absolute immunity on all of plaintiff's claims. Conducting proper sessions with an indicted defendant and her attorney, entering into a cooperation agreement with that defendant, and drafting a criminal complaint are all prosecutorial functions. Plaintiff argues that Dunnan should not be entitled to absolute immunity because she coerced the witness into falsely identifying plaintiff as the shooter. That argument fails for several reasons. First, plaintiff admits in the complaint that the witness had already identified plaintiff as the shooter to police, both by name and through a photo array. So there was probable cause to arrest plaintiff before Dunnan even met with the witness. He also does not allege any facts that support his allegation that the cooperation agreement was coercive. He simply alleges that Dunnan proposed a deal where the witness would tell the truth about having seen Norelle shoot the victim, and that if she did so, her criminal case would be resolved with a misdemeanor and time served. This is a standard cooperation agreement. Nowhere does he allege there was a side deal or that the ADA implied that the witness should lie and falsely identify plaintiff. But even if the deal were deemed coercive, Dunnan is still entitled to absolute immunity because, again, conducting a proffer session and entering into a cooperation agreement, which was signed in open court as part of a plea proceeding, are the actions of an advocate and not an investigator. If there are no questions, I will rest on our papers. Okay. Thank you, Ms. Stackhouse. I will turn it back to Mr. Hoffman on rebuttal. Yes, I want to point out that an eyewitness identification can give probable cause. But the court in Zara v. City of New York observed that the Second Circuit says that that doesn't end the inquiry. You know, the appropriate question is whether a person of reasonable caution, taking into account potential questions about the informant's veracity, would be warranted in finding probable cause. And I submit to you that there were all kinds of problems with this witness's veracity. That should have given pause. We keep talking about- You should have observed that oftentimes there are witnesses who have criminal histories or substance abuse problems and so on. That happens in criminal investigations. Is there something about the veracity of T.T. here that makes this case unique or different from the average case? Yeah, we talked in the papers about a couple of cases. One was Betz. One was Rollins, I believe. But the idea was in those cases there would be either corroborating information. And here all we have is the word of Acevedo. And I really do urge you to look at the language of the criminal complaint and the language in the grand jury testimony and trial testimony because the questions are definitely tailored to give the impression that he himself made an independent identification. And that's the only corroboration of what she is saying. But in those cases anyway, Betz and Rollins, they talk about corroboration. But they also talk about did the officers know that she was intoxicated, mentally ill? I am alleging in the complaint that the defendants knew that she was deeply mentally ill and on all kinds of intoxicants at all times. They knew that Morales was 5'4", not 6'2", as the officers had originally identified her. I think that she did have mental illness or substance abuse problems, and they knew that. But let's assume they also knew that she was at the incident and was a witness to it. What should the officers have done? Not sought out her testimony as to what she saw there? No, I think just to add to Your Honor's point, they also knew that she had a history of lying to police and implicating people she knew that were dear to her like her sister. So it's not unique at all that she happened to know Tyson or Morales or whatever since he was a kid. She has implicated her own sister to get out of her crimes, and the defendants knew that. But they should have corroborated. I think that's, you know, in Corona v. Lynn or Lunn, I'm sorry, there was a finding of probable cause, but police did not merely take the informant's account at face value. They explicitly questioned her in follow-up interviews. They independently sought to corroborate essential details of her story, examining prison records, inspecting the premises of the women's unit, and interviewing other witnesses. None of that was done here. None of that was done. Okay. Thank you, Mr. Hoffman. The case is submitted.